## SLEIGHT *vs.* READ and others.

18  159
61h  378

The act of April 11th, 1849, amending the act of April 7th, 1848, for the more effectual protection of the property of married women, which enacts that all future property, descending to the wife, shall be transmitted to her, to her sole and separate use, and that she shall hold the rents, issues and profits thereof in the same manner, and with the like effect, as if she were unmarried, was in effect a modification of the laws of inheritance, entirely within the control and direction of the legislature.

This modification does not operate on a marriage contract made before the passage of the act, so as to be within the scope of the provision of the constitution of the United States prohibiting the passage of state laws impairing the obligation of contracts; because the interest of the husband in the future acquisitions of the wife is subject to the power of the legislature, in controlling and directing the acquisition and disposition of property; and this contingency was an ingredient of the marriage contract.

A judgment recovered against a husband, for a debt contracted prior to the passage of the act of April 7, 1848, for the more effectual protection of the property of married women, is not a lien upon lands acquired by the wife, by descent, subsequent to that act.

And if the lands are sold, under a prior mortgage, and the surplus moneys are brought into court, the judgment creditor is not entitled to have them applied in satisfaction of his judgment.

Any person, whatever may be his prospective possible rights, arising from existing legislation, in regard to property not yet vested in him, is liable to have them abridged or altogether revoked, by any future legislation; whether such person is an heir apparent, heir presumptive, or stands in the relation of a husband whose wife may at any time afterwards become entitled to property. *Per* .CLERKE, J.

The marriage contract does not imply that the husband shall have the same interest in the future acquisitions of the wife, that the law gives him in the property she possesses at the time of the marriage, but *that ‖he shall have whatever interest, if any, the legislature, before she is invested with them, may think proper to prescribe. Per* CLERKE, J.

THIS was an appeal from a decision made by Justice Roosevelt, at a special term, on exceptions to the report of a referee, in respect to the surplus moneys arising from the sale of mortgaged premises. The appeal was by Henry Whinfield, who was not a party in the suit, but who claimed a lien upon the surplus moneys as the assignee of certain judgments, recovered by John B. Vail against the husbands of two of the daughters of the mortgagor.

Sleight *v.* Read.

*J. D. Sherwood,* for the appellant.

*Bell & Coe,* for the defendants.

*By the Court,* CLERKE, J.   Cornelius Read, who was the mortgagor of the premises foreclosed in this action, died intestate, April 30, 1849, leaving a widow, one son and two daughters. The daughters are, Mrs. Bishop, wife of Joseph Bishop, and Mrs. Alexander, wife of John Alexander; both were of age at the time of their father's death, and both were married in 1846 or 1847.   There is issue of the marriage of Mr. and Mrs. Bishop, but none of that of Mr. and Mrs. Alexander.   John B. Vail recovered a judgment against Bishop, April 16, 1849, for $380.79, and another against Alexander, Nov. 17, 1848, for $549.37.   Both judgments were for debts contracted prior to April, 1848.   The judgment against Bishop is collateral to that against Alexander, to the extent of $200.   Both judgments were assigned by Vail to Whinfield, the present claimant.   Of the surplus moneys ($2191.18) arising from the sale of the mortgaged premises, the referee reports that Mrs. Bishop and Mrs. Alexander are, each, respectively entitled to $611; the share of Mrs. Bishop being subject to the tenancy by the curtesy of her husband, and that of Mrs. Alexander, to the life estate of her husband, during their joint lives; and that Whinfield, by virtue of the judgments, is entitled to the income arising from those shares during the respective lives of the husbands, until the judgments, less $200, shall be paid.   I presume the referee meant, also, that Mrs. Bishop's share was subject to the life estate of her husband, as well as to his tenancy by the curtesy (*initiate.*)   To this report Mrs. Bishop and Mrs. Alexander except, claiming the exclusive and absolute enjoyment of those shares.   The exceptions were allowed at special term; from which decision the claimant Whinfield appeals.

By the common law, the husband has a freehold interest in his wife's lands; and both husband and wife are seised in her right. He has a title to the rents and profits during coverture; the estate remaining entire to the wife or her heirs upon the disso-

Sleight *v.* Read.

lution of the marriage; and, upon the wife's death, the husband, if he survives, becomes a mere tenant by sufferance, unless there has been issue of the marriage; in which case he is entitled to the continued enjoyment of her inheritance, during his life. The husband's interest, both in the rents and profits during coverture, and in the estate, as tenant by the curtesy, is subject to be taken on execution; although it was formerly doubtful, whether the right of a tenant by the curtesy, when it was only *initiate*, as in the present case, could be sold on execution; but I believe it is now considered as settled, having never been questioned in this state, since *Schermerhorn and Clute* v. *Miller and wife*, (2 *Cowen*, 439.)

But, does it necessarily follow, because by common law or by statute, a judgment creditor has a lien upon such interests, and can sell them upon execution, that, when the land is sold and the proceeds are paid into court or are so situated as to be within its equitable direction and control, this lien is so absolute and paramount as that the court cannot order those proceeds to be preserved for the exclusive benefit of the wife, divested of any claims against the husband?

The present application, recollect, seeks the equitable interposition of the court to assist the creditor of the husband to appropriate the property of the wife to the payment of the husbands' debts—debts contracted long before the wife succeeded to the inheritance. It is not at all unusual—indeed the instances are very numerous under our system of jurisprudence—for a court of equity to interrupt the enjoyment of a positive legal right for the purpose of preventing a mischief, and avoiding a palpable hardship. And this is eminently and frequently the case where, what is called the "wife's equity," becomes the subject of consideration. Wherever an application is made on behalf of the husband, or of any person claiming in his right, to reduce into possession his wife's fortune, or to appropriate any part of it by virtue of a mere legal right, the court will, in most instances, insist on a provision for her out of it, where no adequate settlement has been made on her, and will not suffer the property to be removed out of its jurisdiction; unless she

has been already sufficiently provided for, or unless, upon her personal examination, she waives the benefit of this protection. And this is called "the wife's equity." (*See Clancy's Rights of Women*, 441, *quoting from Macauley* v. *Phillips*, 4 *Ves.* 17.)

Thus, equity frequently modifies the maxim of law, by which the personal property of the wife and the rents and profits of her real estate, during her life, become vested in the husband; and if the husband applies for the assistance of the court to procure the possession of any part of his wife's fortune, the application will be refused, unless he make a provision for her, out of it. The equity of the wife attaches, not only to that part of her fortune which is purely equitable, (usually vested in trustees, though no longer requisite in this state,) but it was deemed to extend to legacies bequeathed to the wife, though not vested in trustees, and, in short, to all cases where it is necessary to apply to the court to enable him to obtain possession of personal property in right of the wife.

The husband has been, in several instances, restrained from reducing into possession the wife's *choses in action*, until an ample provision should be made for her. This equitable protection is not restricted to applications made by the husband himself; but it is extended to applications made by the general or particular assignees of the husband; whether the transfer of his interest was by operation of law, where he becomes bankrupt or insolvent, or was made by his voluntary act to general assignees, or by particular assignment of the interest to an individual; and it is a matter of no importance whether the transfer was made for a good and valuable consideration, or was altogether nominal and voluntary.

The case on this latter point, referred to by Mr. Clancy, (*The Earl of Salisbury* v. *Newton*,) and reported in *Eden's Chancery Cases*, 370, has been always very much relied upon, having been decided in July, 1759, in chancery. (*See Udall* v. *Kenney*, 3 *Cow.* 590, *in the Court of Errors.*) A married woman being entitled to a sum of money, in the hands of trustees, her husband made no provision for his wife or children, and being indebted to the Earl of Salisbury, assigned, as a security for that

debt, the sum of money to which his wife was entitled, and died. The Earl of Salisbury filed his bill to compel the trustees to assign ; but the lord keeper (Henley) refused to give him any relief, as he could be in no better situation than the husband.

Even less favor has been shown to mere creditors of the husband. In applications of this nature, it has been declared that the creditor of the husband, who has no assignment, has no claim ; and as to a specific voluntary assignment for a valuable consideration, Judge Savage, in *Udall* v. *Kenney*, declares, that he fully concurs with his honor the chancellor, when he says, " I consider the wife's equity as against any assignment, whatsoever and to whomsoever, to be now too well settled to be shaken." Judge Savage reviews nearly all the cases on the subject, in his opinion in that case, and was sustained by a large majority of the court, (24 against 3,) affirming the decision of the chancellor.

It will thus be perceived, that the " wife's equity" is sanctioned, as decisively by authority, and consequently possesses the force of law in as great a degree, as the right which it assumes to qualify and control. It is the product of a gradual effort to attemper the rigor of a rule, which, if carried to its extreme consequences, would work manifest injustice ; it is a beneficent contrivance to compensate claims, which otherwise would make the marriage relation one of gross inequality ; and it does not, as many suppose when the word equity is mentioned, rest in the abstract and *a priori* notions of right, which an individual judge may entertain, but, like all the principles now prevailing in courts of equity, is as much the fruit of experience, and is sustained by precedent to as great an extent, as any of the principles and maxims which have had their origin in " courts of common law."

If the wife's equity will be protected against an assignee who has given a good and valuable consideration to the husband, on what ground should the owner of a judgment, recovered for a debt contracted before the property descended to the wife, be entitled to more favor ? It rests altogether with the court as to what amount of the wife's estate shall be secured to her, and must necessarily be determined by the circumstances of each

case. (*Udall* v. *Kenney*, 3 *Cowen*, 606.) The provision for the wife must be adequate ; a part, or even the whole, may be allowed.

In the case before us, there are two married women, seeking to preserve the amount of six hundred dollars each, belonging to them in their own right, from the grasp of their husbands' creditors. The judgments were recovered against their husbands in 1848 and 1849, which this application proves they have been unable to pay, showing clearly that they are in such narrow and embarrassed circumstances, that they can make no adequate provision for their families. Consequently, if the amounts in question were much larger, we would leave the whole to the exclusive enjoyment, respectively, of Mrs..Bishop and Mrs. Alexander.

In addition to these considerations, I agree with the judge at special term, in his views of the effect which the act passed April 11, 1849, relative to the more effectual protection of the property of married women, has upon this case.

What were the rights which actually vested in the husband previous to that act? In regard to real property, *belonging to the wife at the time of the marriage*, he took a vested interest, and became at once entitled to the rents and profits during their joint lives, and, in the event of the birth of a living child, to a contingent right, on the death of his wife, to the sole enjoyment of the estate during his life ; but, *as to any of her future ac-quisitions*, the nature and extent of his interest were subject to any change which the legislature might thereafter make in the laws relating to the acquisition, disposition and enjoyment of property. All regulations of this kind, the rules of inheritance, the rules relating to wills, successions and conveyances, and all the provisions by which the transmission of property is either directed or intercepted, are the offspring of law, and entirely dependent on the legislative power.

Any person, therefore, whatever may be his prospective possible rights, arising from existing legislation, in regard to property not yet vested in him, is liable to have them abridged or altogether revoked by any future legislation ; whether such per-

Sleight *v.* Read.

son is an heir apparent, heir presumptive, or stands in the relation of a husband, whose wife may at any time afterwards become entitled to property. The marriage contract does not imply that the husband shall have the same interest in the future acquisitions of the wife that the law gives him in the property she possesses at the time of the marriage, but *that he shall have whatever interest, if any, which the legislature, before she is invested with them,* may think proper to prescribe. This is precisely the kind of contract to which Mr. Bishop and Mr. Alexander were respectively parties, at the time of their respective marriages ; and *this contract,* or the obligation to enforce it, has certainly not been *impaired* by the act of 1849.

Mrs. Bishop and Mrs. Alexander married previous to the death of their father, from whom this property descended, and previous to the enactment of this statute. Instead of the law, which existed at the time of their marriage, giving the husband a right to the rents and profits during the joint lives of the husband and wife, the legislature, in its wisdom, at all events in the legitimate exercise of its power, deemed it proper to enact that all future property, descending to the wife, should be transmitted " to her, to her sole and separate use," and that she should hold " the rents, issues and profits thereof in the same manner, and with the like effect, as if she were unmarried."

This was in effect a modification of the laws of inheritance, entirely within the control and direction of the legislative power. This modification does not operate on a marriage contract made before its passage, so as to be within the scope of the provision of the constitution of the United States, prohibiting to the states the passage of laws impairing the obligation of contracts; because, as I have shown, the interest of the husband in the future acquisitions of the wife is subject to the power of the legislature, in controlling and directing the acquisition and disposition of property ; and this contingency was an ingredient of the contract.

The order of the special term should be affirmed, with costs.

[NEW-YORK GENERAL TERM, June 1, 1854. *Mitchell, Roosevelt* and *Clerke*, Justices.]